In the Matter of DAVID BATT, an Attorney, Respondent.

First Department, November 21, 1930.

*Isidor J. Kresel* [*Sidney Handler* of counsel], for the petitioners.

*Robert H. Elder,* for the respondent.

DOWLING, P. J. Respondent was admitted to practice as an attorney and counselor at law in the State of New York at a term

of the Appellate Division of the Supreme Court of the State of New York, First Department, on October 12, 1914.

The respondent, as a result of the Ambulance Chasing Investigation, is charged with misconduct as an attorney and counselor at law, briefly, as follows: (1) Improper solicitation of retainers in negligence cases; (2) retaining moneys in settlement of infants' cases without obtaining court orders authorizing settlement, or fixing respondent's compensation, in violation of section 474 of the Judiciary Law; and (3) submitting to the court false affidavits verified by respondent in support of applications for leave to discontinue infants' actions brought by him in the Supreme Court for the purpose of avoiding the jurisdiction of that court to fix his compensation as attorney therein.

The learned referee, to whom the matter was referred after respondent had answered, has duly reported, and a motion is now made by the petitioners for such action as to this court may seem just and proper.

The learned referee found that there was no substantial evidence to support the charge of improper solicitation. In fact, his report shows that the petitioners virtually abandoned that charge at the first hearing before him. On the motion now before the court the petitioners state that they concur in the referee's finding as to this charge.

As to the charge involving violations of section 474 of the Judiciary Law, it appears from the referee's report that in twelve infants' cases, involving settlements for amounts ranging from $100 to $375, the respondent retained one-half of the settlement in each case for his fee, with the consent of the guardian, but without an order of the court fixing the fee. The learned referee construed section 474 of the Judiciary Law (as amd. by Laws of 1912, chap. 229) as giving an attorney permission, rather than compelling him, to apply for a summary determination by the court of the amount of his compensation in infants' cases, and, therefore, the learned referee concluded that he could not base a finding of serious professional misconduct on the evidence as to this charge. In *Matter of Uran* (227 App. Div. 496, 499) this court said: " It should be understood that the statutory requirement that an order shall be obtained in every case approving the attorney's contingent agreement is mandatory and not permissive and applies to small cases as well as to large ones." (See, also, *Matter of Goldberg*, 227 App. Div. 502; *Matter of Jeromer*, 228 id. 123.)

As to the third charge, it appears that in a number of instances where respondent originally instituted actions to recover damages

on behalf of infants in the Supreme Court, he obtained orders of discontinuance of such Supreme Court actions on affidavits verified by him in which he stated the purpose of the discontinuance as follows: " That your deponent is desirous of bringing an action in a lower court in behalf of this infant, where a trial may be secured in a much shorter time than would be required were this case to remain on the calendar of this Court."

The petitioners charge: " That at the time the respondent verified and submitted such affidavits to the Supreme Court he had agreed to settle said claims of said infants, and respondent's reason for obtaining a discontinuance of the said actions in the Supreme Court was not to enable him to bring other actions for said injuries in the Municipal Courts in behalf of said infants or to procure speedy trials of the actions, but for the purpose of avoiding the necessity of applying to the Supreme Court for orders authorizing such settlements and fixing the fees of the respondent for his services rendered in behalf of said infants."

The referee found that these affidavits were not true. In his report he states: " The explanation is that they were verified by the respondent without reading them upon the mere statement of his assistant that they were for orders of discontinuance and that he signed and verified them upon such statement without knowing that they were cases in which he himself had practically effected settlements."

Respondent's testimony is to the effect that frequently when he received a retainer he would not know whether the injuries were serious, but he proceeded with the case and brought it in the Supreme Court; that some months later when it was discovered that the injuries were not as serious as had been thought, permission would be obtained from the defending insurance company to discontinue the Supreme Court action and bring one in the Municipal Court, for the reasons, to quote respondent, " desiring not to encumber the court with extra cases; and also because we felt we would get a speedier trial in the Municipal Court for that particular case also." His instructions to his chief stenographer or secretary were to " institute an *ex parte* order, I had the permission of the insurance company, and to put that first through the Supreme Court and then later institute an action in the Municipal Court."

Respondent's stenographer, or secretary, Miss Minnie Asner, testified, in part, as follows: " Mr. Batt would from time to time hand me some files and say the injuries in these cases are not as serious as I thought they were. I have an agreement with the insurance company whereby these cases can be discontinued in the Supreme Court. Make *ex parte* orders of discontinuance in

these cases and start the actions in the Municipal Courts, which I did. At the time I put the memorandum on the outside of the files to that effect. I put those on my desk, as at that time we were very busy, and in fact we got about 750 cases a year and we were always three or four weeks behind in our work. So I kept these files on my desk intending to write these *ex parte* orders as soon as I got an opportunity to. Some weeks later Mr. Batt would say to me, ' I have settled such and such a case, put an order of compromise through the Municipal Court.' I would take these files, I would look for these files and I would have to go to the file cabinet, sometimes the file was in the cabinet and sometimes I found the file on one of the clerks' desks, and then I would send for the clients and draw up a Municipal Court compromise. On the outside of the file I had my original memorandum that a Supreme Court order of discontinuance should have been drawn, an *ex parte* order of discontinuance. I looked inside the file and I saw no order of discontinuance, so I immediately while the client was there drew the compromise order, the Municipal Court compromise order, and then drew the *ex parte* order of discontinuance at the same time, because the file was taken from my desk and I had no knowledge that the file was taken from my desk until after Mr. Batt had come in and told me that the case was settled, that he had settled the case, and it was important for me to get the settlement papers through instead of putting the Supreme Court order of discontinuance through, therefore the Supreme Court order of discontinuance and the compromise order are dated about the same date. And also, secondly, I was at all times so busy, we were three or four weeks behind in our work, that in order to get more important work through I did not consider the Supreme Court order of discontinuance until Mr. Batt called my attention that the case was settled. * * * I thought it was most important to get the settlement through and that it didn't really matter whether the case was discontinued before or later."

Both respondent and Miss Asner testified to an office procedure whereby Miss Asner would place before respondent a large number of letters and other papers requiring respondent's signature, and without attempting to read them, and with the utmost faith in his secretary, respondent would sign. Respondent's testimony as to this is, in part, as follows: " So sometimes she handed me on the desk, there was a huge stack of affidavits and there was a huge stack of letters and there were all kinds of things, and she would turn the bottom of the paper like this to me and say this is an affidavit to discontinue an action in the Supreme Court, will you

sign it? I had no opportunity to read it. If I ever attempted to read all these papers it would have taken hours."

The settlement agreement, the order of discontinuance of the Supreme Court action, the affidavit of respondent on which such order was based, the compromise order in the Municipal Court action, and the release of the guardian *ad litem*, in the instances as to which proof was offered, are of such a contemporaneous character as to be suspicious and would warrant the inference urged by petitioners. Viewed in the light of the plausible testimony of respondent and his secretary, the suspicion is destroyed. The referee, who accepted such testimony, in his first report, states: " * * * the explanation of the respondent and the witness Minnie Asner, if credited, rebuts any inference of an intention to deceive the Court. That explanation is that it was the respondent's practice in cases in which Supreme Court actions were brought and in which the injuries proved not to be serious to discontinue the Supreme Court action for the purpose of obtaining a speedier trial in the Municipal Court. For that purpose practically a form affidavit was used. The witnesses did not recall specific cases, but Miss Asner testified that it occasionally happened that through some oversight or the mislaying of papers the instructions to obtain orders of discontinuance were not carried out, and that on discovering that fact on a settlement being made, she, whose duty it had been to obtain such orders, went ahead on her own initiative and obtained them. It appears more probable that there was the delay in obtaining the Supreme Court orders of discontinuance, as explained by Miss Asner, than that the respondent resorted to the practice of deception, and even to perjury, for the purpose of avoiding the jurisdiction of the Supreme Court in cases involving relatively trivial amounts. The petitioner says that the cases proven are only typical. Upon the evidence, I shall have to assume, however, that they were exceptional. If the respondent had adopted any such practice as that supposed for the purpose charged, it should not have been difficult to prove it and to find at least one case in which the motive assigned could reasonably be supposed to have existed. Considering the number of infants' cases handled by the respondent, it is not surprising that delay should have occurred as explained in obtaining orders of discontinuance in six. At any rate, there is no evidence to impeach or contradict the said testimony of the respondent and of Miss Asner."

The learned referee has accepted the testimony of respondent and his stenographer as to this charge, and upon such an issue of fact we are not disposed to disturb his finding though the respond-

ent's explanations in the specific cases enumerated are not entirely convincing to us.

As the result of all the proof on the specific charges hereinbefore referred to, there has been established a course of procedure or manner of conducting his ·office and affairs as an attorney and counselor at law which shows respondent's failure to appreciate professional responsibility. In *Matter of Axtell* (229 App. Div. 323) we condemned a plea of pressure of business as an excuse for failure to properly supervise the workings of his office by a member of the bar. Speaking of the situation presented by the record r ow before us, as to respondent's heedless and reckless manner of signing affidavits upon which the court was asked to act, the referee said: " The respondent's explanation discloses a failure of appreciation of his professional responsibilities and obligations. A lawyer should not thus casually and inadvertently verify affidavits for any purpose, least of all as a basis for court action. In my opinion, the respondent's conduct as explained by himself at least merits severe censure."

With this conclusion of the learned referee we agree, and the respondent should be severely censured.

MERRELL, FINCH, McAVOY and SHERMAN, JJ., concur.

Respondent severely censured.